420 A.2d 548

MILL–MAR, INC.

v.

Frank and Alma STATHAM, James E. and Harriet J. Keena, Ronald V. and Bonita L. Kalwara, John C. and Anna M. Myers, Walter T. and Henrietta J. Hynicka, George P. and Sharon J. Olsen, Richard D. and Patricia A. Claffey, Mary Lorene Fox, Daniel J. and Madelyn E. Ward, Richmond Hills Savings Bank, Crockett Mortgage Co., Federal Mortgage Assoc., Fulton National Bank, Commonwealth National Bank and First Federal Savings and Loan Assoc., their heirs and assigns and all successors in title to a parcel of real estate situate in East Hempfield Township, Lancaster County, Pennsylvania.

Appeal of Frank and Alma STATHAM and James E. and Harriet J. Keena.

Superior Court of Pennsylvania.

Argued March 19, 1979.

Filed May 23, 1980.

Reargument Denied July 28, 1980.

Menno B. Rohrer, Lancaster, for Frank Statham and Alma Statham, appellants.

D. Patrick Zimmerman, Lancaster, for James E. Keena and Harriet J. Keena, appellants.

David E. Wagenseller, III, Lancaster, for Mill–Mar Inc., appellee.

Before PRICE, SPAETH and LIPEZ, JJ.

LIPEZ, Judge:

Appellee Mill–Mar, Inc. (Mill–Mar), a land developer, hired[1] a surveyor to survey its property and prepare a subdivision plan for recording, as required by Lancaster County ordinance.[2] The surveyor's negligence in executing the plan resulted in the incorrect plotting of a road constructed by Mill–Mar through the subdivision. Mill–Mar then conveyed various parcels of land fronting on the road to one John C. Myers, a builder. Myers, after constructing a house on each lot, sold one to appellants Statham and another to appellants Keena. Some time after appellants had settled with Myers and moved into their new homes, they discovered that the descriptions of the lots in the deeds from the builder did not agree with the boundaries of the properties as actually occupied.

In order to clear the way for dedication of the road to the municipality, Mill–Mar brought an action to quiet title against the appellants (and numerous other purchasers and mortgagees). Appellants counterclaimed, seeking money damages. They alleged that 1) the deeds overstated the area of their respective lots; 2) as a result of the faulty

1. Whether the position of the surveyor vis–a–vis Mill–Mar was that of independent contractor or employee was disputed below, but, in view of our resolution of this appeal, this issue is immaterial.

2. The ordinance was adopted pursuant to the provisions of the "Pennsylvania Municipalities Planning Code" 53 P.S. § 10101 et seq. applicable to various municipalities enabling them in general to plan their development, and "to govern the same by . . . land development ordinances. . . . (See Historical Note under 53 P.S. § 10101); and under the grant of power at § 10501 to enact such ordinances.

survey, the Statham's house encroached upon a pipeline company's right–of–way; and 3) that the "confusion and uncertainty" engendered by the incorrect descriptions of the properties left appellants unable to convey good and marketable title thereto. The court below granted summary judgment in Mill–Mar's favor on its complaint and on appellants' counterclaims.

Summary judgment may be granted only when there be no issue of material fact. *Granthum v. Textile Machine Works*, 230 Pa.Super. 199, 326 A.2d 449 (1974). All inferences must be drawn against the moving party. *Husak v. Berkel, Inc.*, 234 Pa.Super. 452, 458, 341 A.2d 174, 177 (1975).

 The trial court held that appellants had no cause of action against Mill–Mar because the parties had not been in contractual privity *inter se*. The record clearly shows, and appellants admit in their brief, that no contractual privity between Mill–Mar and them existed. However, appellants claim, on this appeal, that Mill–Mar is liable to them under Restatement of Torts 2d § 552, which provides:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(c) The liability of one who is under public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Although we agree that section 552 should govern actions in this jurisdiction whose facts fall within its provisions, we affirm the order of the court below because appellants' counterclaim does not allege facts sufficient to raise a claim thereunder.

## I.

Cases similar to the present one have traditionally been considered in terms of contractual warranties (recovery being denied to those not in privity of contract with the breaking party), *see, e. g., Bilich v. Barnett,* 103 Cal.App.2d Supp. 921, 229 P.2d 492 (1951), but the modern trend has been to follow section 552. Thus, although we have been unable to find any prior Pennsylvania appellate cases on this issue, the Supreme Court of Illinois has held that "lack of direct contractual relationship between the parties is not a defense in a tort action in this jurisdiction.... [T]ort liability will henceforth be measured by the scope of duty owed rather than the artificial concepts of privity." *Rozny v. Marnul,* 43 Ill.2d 54, 250 N.E.2d 656, 660, 35 A.L.R.3d 487, 496 (1969). Although section 552 had not been formally approved when *Rozny* was decided, the court held therein that the section was "apposite[.]" 250 N.E.2d at 662–63, 35 A.L.R.3d at 499. The *Rozny* court ably summarized the development of the law of recovery, by persons not party to a certain contract, for negligent performance of contractual duties:

The principle that performance of a private contract can give rise to duties in tort seems to have been first articulated in the 19th Century. While attempts to recover by third parties injured by negligent performance of contractual duties had generally failed because of lack of privity, this restriction in cases involving physical injuries was

lifted in cases such as *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050, and *Heaven v. Pender*, 11 Q.B.D. These extensions of liability, however, generally involved negligence resulting in tangible physical harm and not merely loss to intangible economic interests. Further extension to the intangible economic interests soon resulted. (*Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275, 23 A.L.R. 1425.) There, liability was predicated upon the fact that the public weigher of beans at a seller's request was liable to the buyer damaged by negligent overstatement of the weight because the weigher knew the buyer would rely on the erroneous weight statement. While the later case of *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139, held an auditing firm which negligently certified an inaccurate audit not liable to one who, in reliance upon the audit, loaned money to the actually insolvent firm, the court carefully distinguished *Glanzer* on the grounds that there the weight statement was "primarily" for the use of the purchaser while the *Ultramares* audit statement was only "incidently" for the use of third parties. However, the facts of the two cases are such that it seems clear that the more persuasive factor was the existence in *Ultramares* of potential "liability in an indeterminate amount for an indeterminate time to an indeterminate class."

It is apparent that many of the courts which have considered analogous situations have thought the potential liability of one who negligently supplies inaccurate information to be such as to militate against imposing liability when the person ultimately damaged was one whose reliance on the information might have been called "foreseeable," [citations omitted], but have been willing to impose liability when the reliance of the third person might have been said to be "known." [citations omitted] Although the absence of privity may have been the stated reason for denying liability, it seems likely that the virtually unlimited and unknown potential responsibility of the defendant weighed heavily in the court's thinking. (Some courts in addition to *Ultramares* candidly state this reason, e. g.,

*Anderson v. Boone County Abstract Co.* (Mo.1967), 418 S.W.2d 123, 127.)

An excellent article by Dean Prosser, Misrepresentation and Third Persons (1966), 19 Vand.L.Rev. 231, discusses a number of factors which have affected the decisions in the third–party misrepresentation cases. In the class of cases where "plaintiff is an unidentified member of a group or class [and] defendant has special reason to expect that any member of it may be reached and influenced" by his representation, the liability for negligent misrepresentation resulting in pecuniary loss has been mixed. (19 Vand.L.Rev. at 246.) The article discusses the *Ultramares* case and notes that other decisions concerning accountants are in accord.

250 N.E.2d at 660–62; 35 A.L.R.3d at 496–98.

Such cases must be decided individually, each on its own facts. Particular care must be taken that what is being sought is not, in the words of Chief Judge Cardozo, "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Ultramares Corp. v. Touche*, 255 N.Y. 170, 178, 174 N.E. 441, 444, 74 A.L.R. 1139, 1145 (1931).

## II.

The Pennsylvania Rules of Civil Procedure require that material facts on which a cause of action is based be stated in the pleadings. Pa.R.Civ.P. 1019(a). Pleadings "are limited to a complaint, an answer thereto, a reply if the answer contains new matter or a counterclaim, a counter–reply if the reply to a counterclaim contains new matter, a preliminary objection and an answer thereto." Pa.R.Civ.P. 1017(a). A party is limited to the theory and issues framed by the pleadings. *Bucci v. R. J. Reynolds Tobacco Co.*, 439 Pa. 302, 268 A.2d 88 (1970).

■ Analyzing appellants' counterclaims in terms of section 552, we conclude that appellants have not alleged all of the elements of a cause of action thereunder. Although the counterclaim alleges that Mill–Mar "was negligent in engaging and hiring a surveyor not qualified to do the work properly[,]" and that "the improper legal descriptions [were]

furnished for the deeds of the Defendants[,]" there is no assertion, explicit or implicit, that survey results were obtained by Mill–Mar, or communicated to appellants, "in the course of [Mill–Mar's] business, profession or employment," as is required by paragraph (1) of section 552. In addition, subparagraphs (2)(a) and (2)(b) of the section allow recovery against a supplier of incorrect information only to "persons for whose benefit and guidance [the supplier] *intends* to supply the information, or *knows* that the recipient intends to supply it" or who have relied upon it "in a transaction that [the supplier] *intends* the information to influence or *knows* that the recipient so intends[.]" (Emphasis added.) Nowhere do the counterclaims allege that Mill–Mar was possessed of the requisite intent or knowledge; a court therefore could not properly find that they fall within the class of persons to whom Mill–Mar may be liable.[3]

Since appellants have failed to allege material facts on which a court could properly find in their favor on Mill–Mar's motion for summary judgment, the order of the court below must be

Affirmed.

SPAETH, J., files a dissenting opinion.

SPAETH, Judge, dissenting:

I believe the lower court acted too quickly in entering summary judgment, for as I read the record, a genuine issue

3. We point out also that the allegation in the counterclaims that the incorrect plan was recorded on Mill–Mar's behalf as its plat, even when considered in conjunction with Mill–Mar's admission thereof in its *Complaint*, and its further admission therein that the legal descriptions in appellants' deeds were derived therefrom, is insufficient as an assertion of the proper intent or knowledge, since the purpose of the statute authorizing recording is only to exercise the state's and municipality's police power by governing the kind of land development that may be permitted. *See* 53 P.S. § 10105. Any reliance thereon by subsequent purchasers is only an incident of the recordation required by the ordinance. Any other interpretation of the legal consequences of the recordation of such plans could, and very well might, result in the limitless liability envisioned by Chief Judge Cardozo in *Ultramares*.

as to a material fact exists, which a jury should be permitted to resolve.

Section 552 of the Restatement (Second) of Torts states:

552. Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Comment (h) points out that this section subjects the negligent supplier of misinformation to liability only to persons whom he intends his information to benefit or guide, either directly or indirectly; the supplier is not liable to persons whom he did not intend his information to benefit or guide but who might foreseeably rely upon it. Thus, in Illustration 12, it is said:

In 1934, A Company, a firm of surveyors, contracts with B to make a survey and description of B's land. A Company is not informed of any intended use of the survey report

but knows that survey reports are customarily used in a wide variety of real estate transactions and that it might be relied upon by purchasers, mortgagees, investors and others. The survey is negligently made and misstates the boundaries and extent of the land. In 1958 C, relying upon the report that B exhibits to him, purchases the land from B, and in consequence suffers pecuniary loss. A Company is not liable to C.

Section 552 and Illustration 12 reflects the decision reached in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), which is one of the seminal cases in the law of negligent representation. In *Ultramares*, an accounting company prepared an inaccurate balance sheet for one of its clients. Another company relied upon the balance sheet when it loaned money to the accounting company's client. Although the company relying on the balance sheet suffered loss, the New York Court of Appeals, per CARDOZO, J., held that it could not recover against the accounting company because the accounting company had prepared the balance sheet for the use of its client, and not specifically for the company that had loaned money to the client. The court acknowledged that the accounting company knew that in the usual course of its client's business, banks, creditors, stockholders, purchasers and sellers might all rely on its balance sheet. Nevertheless, the court refused to hold the accounting company liable on that basis, reasoning that to do so would create the danger that the others in the position of the accounting company might be held liable "in an indeterminate amount for an indeterminate time to an indeterminate class." 255 N.Y. at 178, 174 N.E. at 444. *But see Rusch Factors, Inc. v. Levin*, 284 F.Supp. 85 (D.R.I.1968).

In *Rozny v. Marnul*, 43 Ill.2d 54, 250 N.E.2d 656 (1969), the court held that the defendant could be held liable for negligent misrepresentation where, in contrast to the evidence in *Ultramares*, it appeared that the defendant had intended to inform the plaintiff specifically. In *Rozny*, a surveyor did a

survey for a builder who then conveyed the property in question to a third party. The survey was inaccurate and the third party sued the surveyor. The court allowed recovery, noting, among other things, that the defendant knew that the survey was not solely for the builder but would be used and relied on by the plaintiff specifically, and that the defendant's potential liability was thus not indeterminate.

Here, the majority believes that appellants should not recover from appellee because they have not alleged in their counterclaim that appellee intended to supply the inaccurate subdivision plan to them or knew that John Myers intended to do so. At 552. In this regard, the majority states that appellee's admission in its complaint that the legal descriptions in appellants' deeds were derived from the incorrect subdivision plan was not a proper substitute for an allegation by appellants in their counterclaim that appellee had intended to supply this information to appellants. At 552, n. 3. The majority also believes that appellee cannot be liable to appellants merely because it recorded an inaccurate subdivision plan since the purpose of the recording requirement is only to permit state and local authorities to govern land development. At 552, n. 3.

Initially, I submit, the majority should not have confined itself to the parties' pleadings in deciding the propriety of the lower court's entry of summary judgment, particularly where, as here, the pleadings are quite ambiguous. Pa.R. Civ.P. 1035, which governs the entry of summary judgments, expressly provides that the parties may introduce materials outside the pleadings, including depositions, answers to interrogatories, admissions, and supporting affidavits. Indeed, Goodrich–Amram points out that the summary judgment procedure is "designed to cut through dishonest or evasive pleadings, even though they set forth prima facie averments, by the supplemental use of depositions, admissions, answers, and in some cases, affidavits." Goodrich–Amram 2d § 1035(b):5.

Here, the depositions and interrogatories clarify much of the ambiguity of the pleadings and add additional facts, as follows. On May 10, 1973, appellee recorded the inaccurate subdivision plan with the Lancaster County authorities. Appellee subsequently conveyed all the plots in the subdivision to various buyers, including John Myers, a builder, who on May 16, purchased lot no. 1 and lot no. 2. In order to facilitate the preparation of deeds between appellee and the various buyers, Phares Martin, president of appellee, requested that the surveyor who prepared the subdivision plan furnish him with legal descriptions of each plot. N.T. at 51, Deposition of Phares Martin, 5/25/76. These descriptions were then incorporated into the deeds between appellee and John Myers for lot no. 1 and lot no. 2. Martin testified that he knew that Myers and the other builders constructing houses on the lots would rely on the subdivision plan to stay within the boundaries of the plots. N.T. at 78, Deposition of Phares Martin, 11/9/77. On January 15, 1974, Myers conveyed lot no. 1 and the house he had constructed on it to the Stathams. The deed between the parties included the description of the property found in the earlier deed between appellee and Myers. On June 18, Myers conveyed lot no. 2 and the house he had constructed on it to the Keenas. The deed between the parties included the description of the property found in the earlier deed between appellee and Myers. Neither the Stathams nor the Keenas had any communication with appellee while negotiating the purchase of their respective properties from Myers. Answer of Frank and Alma Statham to Plaintiff's Interrogatory 2(a); Answer of James E. and Harriet J. Keena to Plaintiff's Interrogatory 2(a).

From these facts it may be seen that the question of appellee's liability is much closer than the majority acknowledges. This case does not turn on whether appellee can be held liable to appellants merely because appellee had recorded an incorrect subdivision plan that appellants relied on to their detriment. Instead, it turns upon how "determinate"

or "indeterminate" appellee's potential liability is. Here, appellee not only recorded an incorrect subdivision plan, but also supplied the first purchaser of their property with incorrect descriptions of the property based on incorrect subdivision plan. It is not at all difficult to see that appellee would be liable to Myers as the first purchaser of the property, for it is clear that appellee supplied him with the information with the intention that he be benefited or guided by it. What is more difficult is whether appellee knew that Myers intended to supply the incorrect descriptions of the property to appellants or to other persons who might purchase the property from Myers. Martin admitted that he knew that Myers, as a builder would rely on the incorrect descriptions derived from incorrect subdivision plans. Given this admission, it is certainly possible that Martin also knew that Myers would soon reconvey the property and in doing so would use the same descriptions of the lots that appellee had given him.

It is quite true that Martin's testimony does not go so far as to demonstrate such knowledge. However, given what Martin did testify to, it is difficult to tell whether this case is within the principle of *Rozny v. Marnul, supra,* or of *Ultramares Corp. v. Touche, supra,* and Illustration 12 of the Restatement. It is axiomatic that in deciding a motion for summary judgment, "all doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for summary judgment." *Ritmanich v. Jonnel Enter., Inc.,* 219 Pa.Super. 198, 203, 280 A.2d 570, 573 (1971). *See also Schacter v. Albert,* 212 Pa.Super. 58, 239 A.2d 841 (1968). When all doubts regarding the extent of Martin's knowledge are resolved against appellee as the party moving for summary judgment, this case becomes a case of determinate liability within the principle of *Rozny.* Accordingly, the lower court should not have entered summary judgment in favor of appellees but should instead have ordered the case to trial, leaving it to the jury to decide the issue of whether Martin did or did not know that Myers

would soon reconvey the property, using the inaccurate descriptions that appellee had given him.

I should reverse the order of the lower court.