**MOFFATT ENTERPRISES, INC., Eugene Moffatt, Raymond Moffatt, Robert Moffatt and Sidney Moffatt, Appellants,**

v.

**BORDEN INC., a corporation**

v.

**Kathryn MOFFATT, Patricia A. Moffatt, and Renee M. Moffatt.**

**No. 86–3223.**

United States Court of Appeals, Third Circuit.

Argued Sept. 30, 1986.

Decided Dec. 22, 1986.

Rehearing Denied Jan. 15, 1987.

As Amended Feb. 20, 1987.

---

Daniel M. Berger, Ellen M. Viakley (argued), Berger, Kapetan, Malakoff & Meyers, P.C., Pittsburgh, Pa., for appellants.

Frederick N. Egler, Jr. (argued), Egler, Anstandig, Garrett & Riley, Pittsburgh, Pa., for appellee.

Before WEIS, MANSMANN, and HUNTER, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

The Moffatt brothers—Eugene, Raymond, Robert, and Sidney—and their corporation, Moffatt Enterprises, Inc., appeal from an order granting summary judgment in favor of the defendant, Borden, Inc. ("Borden").

The plaintiffs marketed a urea-formaldehyde foam insulation called Insulspray through a series of yearly distributor agreements with Borden. These agreements contained a release of claims and permitted the parties to terminate their venture upon six months' notice, or not to renew the distributorship at the end of the one-year terms. In their complaint, the plaintiffs allege, *inter alia*, that Borden fraudulently induced them individually to enter into the distributorship agreements when Borden knew of defects in Insulspray which would render the product unmarketable. Additionally, the corporate plaintiff averred that Borden's alleged misrepresentation about Insulspray caused it to purchase unnecessary and expensive equipment.

The district court concluded that any harm to the plaintiffs derived from the defendant's refusal to renew the distributor agreement—a permissible action under the contract's terms. The court then held that the alleged injuries were solely to the corporate plaintiff and that, therefore, the Moffatts as a matter of law lacked standing individually to sue. The court decided, moreover, that the release of claims provision protected Borden from liability, even assuming the truth of the plaintiffs' allegations of fraud and misrepresentation.

We find that the individual plaintiffs have produced evidence to establish claims grounded in fraudulent inducement to enter into the distributorship agreements. We further determine that the corporate plaintiff has presented evidentiary support for its claims of alleged fraud and misrepresentation which caused it to purchase some unnecessary equipment. Finally, we hold that on proof of fraud the plaintiffs may avoid the release provision of the distributorship agreements into which Borden allegedly fraudulently induced them to enter. Moreover, the Moffatts' status as shareholders in Moffatt Enterprises, Inc. does not in itself preclude their individual causes of action. Since the plaintiffs have presented evidence which a jury may find clear and convincing to support a claim of fraud and similarly preponderant evidence which can demonstrate their action for misrepresentation, material issues of fact remain for trial. We will, therefore, reverse the order of the district court which granted summary judgment in favor of Borden.

## I.

### A.

The district court assumed the following facts in ruling upon Borden's motion for summary judgment.

From 1975 to 1978 Borden manufactured and sold Insulspray, a patented urea-formaldehyde foam insulation product. Insulspray is composed of a urea-formaldehyde resin and a surfactant, which a foaming gun mixes and propels into a wall cavity where the mixture hardens.

In March of 1975, Eugene Moffatt contacted Borden to obtain urea-formaldehyde foam insulation, then a new product to the American marketplace, for his home. Eugene learned from Roy Wendt, a Borden salesman, that Borden did not have a distributor for its insulation product, Insulspray, in Eugene's area. Several meetings and telephone conversations were subsequently held regarding the possibility of Eugene becoming an Insulspray dealer. In May, Eugene and Raymond Moffatt met with Wendt and other Borden employees at its laboratory in Bainbridge, New York. There Borden personnel demonstrated Insulspray to Eugene and Raymond and assured them that it was non-toxic and resisted significant shrinkage.

In the fall of 1975, Eugene, Raymond, and Robert Moffatt formed a partnership, Moffatt Enterprises, to distribute Insulspray to authorized dealers in New Castle, Pennsylvania. The partnership, in turn, established Thermal Acoustics, a business which installed Insulspray.

On October 31, 1975, the Moffatts entered into the first in a series of distributor contracts with Borden. The agreement provided in relevant part:

11. Product and Distribution Policy Changes—The Manufacturer [Borden] reserves the right from time to time, in its absolute discretion, without thereby incurring any liability to the Distributor with respect to any purchase order theretofore placed by the Distributor, or otherwise, to discontinue or to limit its production of any product, to terminate or limit deliveries of any product the production of which is so discontinued or limited, to alter the design or construction of any product, to add new and additional products to its lines, to substitute such altered products for the prior products in filling orders, and to change its sales and distribution policies.

\* \* \* \* \* \*

16. No Liability for Termination or Nonrenewal—Neither the Manufacturer nor the Distributor shall, by reason of the termination or nonrenewal of the Distributor's distributorship of said product, be liable to the other for compensation, reimbursement or damages on account of expenditures, investments, leases or commitments in connection with the business or good will of the Manufacturer or the Distributor, or otherwise.

\* \* \* \* \* \*

18. Release of Claims—In consideration of the execution of this agreement by the Manufacturer, and of such sales of said

products as the Manufacturer may make to the Distributor within the term hereof, the Distributor hereby releases the Manufacturer from all claims, demands, contracts, and liabilities, if any there be, as of the date of the execution of this agreement by the Distributor.

As business grew, Sidney Moffatt quit his job at the Lockley Manufacturing Company to work full-time for Moffatt Enterprises in 1976. Eugene, Raymond, and Robert, however, maintained their positions at the Packard Electric Company. Throughout 1976 the plaintiffs received written materials from Borden attesting to the safety and effectiveness of Insulspray.

In January of 1977, Borden created a separate department of its Adhesives and Chemicals Division under General Manager David Sullivan to sell Insulspray. Borden inaugurated a major marketing program one month later with a meeting for Insulspray distributors, including Eugene and Raymond Moffatt, at Amelia Island, Florida. There, Robert Gutheil, then a vice-president in Borden's Adhesives and Chemicals Division, allegedly labeled Insulspray "as safe as the air one breathes and the water one drinks." Borden officials also reported that Borden had thoroughly tested Insulspray and had received no customer complaints.

However, the Consumer Product Safety Commission previously had received several reports of formaldehyde fumes and illness in homes insulated with Insulspray.[1] Borden also was facing two lawsuits over Insulspray. Internal Borden memoranda, moreover, had acknowledged the off-gassing problem in 1975.

At the Amelia Island distributors' meeting in 1977, Sullivan and Gutheil told Eugene and Raymond Moffatt that they would henceforth have to work full-time as Insulspray distributors. Sullivan and Gutheil reassured the Moffatts of Insulspray's safety and effectiveness. The Moffatts thereafter resigned from the Packard Electric Company to form Moffatt Enterprises, Inc.[2] Also at Borden's behest, they later established Insulattic, Inc. to fabricate cellulosic insulation for attics. Borden officials orally assured the plaintiffs that it would renew their distributor agreement every year.

In 1977, the plaintiffs purchased $578,000 worth of material from Borden—over $500,000 more than in 1976. At the same time, the defendant continued to receive health-related complaints about Insulspray without informing the plaintiffs. Borden also witnessed a dramatic downturn in Insulspray's profitability throughout 1977. The defendant concealed its losses from its distributors, however, at sales meetings in the fall of 1977 and in early 1978. Toward the 1978 year's end, the plaintiffs' sales of Insulspray, like those in the industry at large, had significantly declined.

In the fall of 1978, Borden had privately decided to withdraw Insulspray from the market. Nonetheless, Borden representatives urged the plaintiffs at a meeting in Columbus, Ohio to enlarge their distribution area into North Carolina. The plaintiffs aver that in direct reliance on these representations, the corporate plaintiff, in October, 1978, bought bulk equipment to prepare for an expanded territory.

Eugene Moffatt met with Borden salesman Roy Wendt one month later to explore rumors concerning Borden's withdrawal from the foam insulation market. Wendt denied the reports and encouraged the plaintiffs to attend an upcoming trade show in North Carolina. Two weeks after

---

1. The plaintiffs averred in their complaint that the Insulspray process releases formaldehyde, a toxic substance. Specifically, the record evinces that formaldehyde irritates the eyes, lungs, and skin, and in severe cases may even cause death. More importantly, the plaintiffs claimed that Borden recognized Insulspray's hazards before they began marketing it. Borden, in addition, allegedly had concealed that Insulspray would shrink as it dried and, thereby, would lose some twenty-seven percent of its R-value.

2. According to the complaint, Borden fraudulently induced the Moffatts to found Moffatt Enterprises, Inc. and, thereby, caused them to lose sums invested in the business and to leave their former jobs.

they returned home from the trade show, Borden notified the plaintiffs on December 4, 1978 that it would stop producing Insulspray on December 31, 1978.

On that date, the plaintiffs' distributor agreement with Borden expired by its terms. It contained the same contractual provisions reserving to Borden the absolute right to discontinue Insulspray production, and immunizing the parties from liability for not renewing the distributorship, as in the original agreement. Despite the individual plaintiffs' attempts to sustain Moffatt Enterprises, Inc., it ceased to function in 1980.

### B.

On October 18, 1982, the individual and corporate plaintiffs sued the defendant in a Pennsylvania state court. The complaint contained eleven counts based upon fraud, misrepresentation, breach of fiduciary duty, strict liability, breach of warranties, and wrongful termination. Borden subsequently removed the case to federal court where the defendant then answered the complaint and filed a four-count counterclaim. On the plaintiffs' motion, the district court granted partial summary judgment on two counts of the counterclaim[3]; two remain unadjudicated.[4]

Borden then filed a motion for summary judgment on the plaintiffs' complaint, which the district court granted in full, disposing of the plaintiffs' case entirely. The court denied the plaintiffs' motions for reconsideration and to amend their pleading. The district court directed the entry of final judgment on the plaintiffs' claims pursuant to Fed.R.Civ.P. 54(b), and certified them for appellate review according to 28 U.S.C. § 1292(b). The plaintiffs timely filed a notice of appeal.

### II.

The plaintiffs advance four issues on appeal. We recast them, however, to reflect more properly the district court's grounds for decision.

First, the plaintiffs contend that the district court erred in holding that, even assuming their allegations of fraud and misrepresentation, the distributor agreement protected the defendant from liability. Second, the plaintiffs attack the district court's finding that their damages stemmed not from Borden's alleged misrepresentations but from its refusal to continue the production of Insulspray. Third, the Moffatts fault the court's ruling that they lacked standing as individuals to sue Borden since their injuries derived from alleged harm to the corporate plaintiff. Finally, the plaintiffs claim that the district court abused its discretion in denying their motion for leave to amend their complaint to add claims based upon the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. §§ 1961–1968 (1982 & Supp. III 1985).

On review of the district court's grant of summary judgment, we likewise examine whether "no genuine issue as to a material fact remains for trial, and [whether] the moving party is entitled to judgment as a matter of law." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). In applying the law to undisputed facts, our review is plenary. *Koshatka v. Philadelphia Newspapers, Inc.*, 762 F.2d 329, 333 (3d Cir.1985). We may reverse the district judge's refusal to permit the plaintiffs to amend their complaint if the judge abused his discretion with respect to the liberal standard of Fed. R.Civ.P. 15(a) *Adams v. Gould, Inc.*, 739

---

**3.** The court held that an indemnification provision in the distributor agreement did not require the corporate plaintiff to indemnify Borden for products liability and negligence claims, and that Borden could not hold the individual plaintiffs liable as guarantors for debts owing to it.

**4.** The district court decided that the corporate plaintiff breached the distributor agreement by failing to purchase liability insurance; the court, therefore, denied the plaintiffs' motion on that count. The plaintiffs excluded from their summary judgment motion Borden's counterclaim to recover the price of goods for which the corporate plaintiff had not paid.

F.2d 858, 863 (3d Cir.1984), *cert. denied,* 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985).

### III.

### A.

■ We agree, in light of the plaintiffs' allegations of fraud and misrepresentation, that the district court erred in holding that the distributor agreement insulated the defendant from any liability for the plaintiffs' losses.

The district court's analysis might properly apply to a cause of action arising out of the parties' contractual relationship. Yet the plaintiffs have averred fraud in the inducement. Thus, the exculpatory clauses upon which the court and the defendant rely, *see supra* pages 1171–1172, simply fail to respond to the plaintiffs' claims.

Under Pennsylvania law, a defrauded party may pursue several remedies including an action of damages for deceit, recission and restitution based on fraud, and reformation of the contract for fraud. *See Scaife v. Rockwell-Standard Corp.,* 446 Pa. 280, 289, 285 A.2d 451, 456 (1971), *cert. denied,* 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972); *Germantown Manufacturing Co. v. Rawlinson,* 341 Pa.Super. 42, 48–50, 491 A.2d 138, 141–142 (1985). *See generally* 12 S. Williston, A Treatise on the Law of Contracts §§ 1523–1525A (3d ed. 1970 & Supp.1986) (discussing remedies available to defrauded parties); E.A. Farnsworth, Contracts, § 4.15 (1982) (discussing the effects of and remedies for misrepresentation).

The Pennsylvania Supreme Court in *Scaife Co.* set forth the elements of fraudulent misrepresentation:

(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage to the recipient as the proximate result.

*Scaife Co.,* 446 Pa. at 285, 285 A.2d at 454, *quoting Neuman v. Corn Exchange Na-*

*tional Bank and Trust Co.,* 356 Pa. 442, 450, 51 A.2d 759, 763 (1947). *See Germantown Manufacturing Co.,* 341 Pa.Super. at 47–48, 491 A.2d at 141–142; *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa. Super. 90, 107–109, 464 A.2d 1243, 1251–1252 (1983); *Blose v. Martens,* 173 Pa.Super. 122, 95 A.2d 340 (1953); Farnsworth, *supra,* § 4.10. Pennsylvania has adopted Restatement (Second) of Torts § 552 regarding the elements of negligent misrepresentation. Section 552 provides in relevant part:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id., quoted in Mill-Mar, Inc. v. Statham,* 278 Pa.Super. 296, 299, 420 A.2d 548, 550 (1980).

The authorities make clear that a party may avoid a release of claims which another procures through fraudulent assertions of past or existing fact. *Germantown Manufacturing Co.,* 341 Pa.Super. at 47–48, 491 A.2d at 141–142; *Blose,* 173 Pa.Super. at 123, 95 A.2d at 340. *See Neale v. American Motorists Fire Insurance Co.,* 185 Pa.Super. 60, 62, 138 A.2d 290, 291 (1958); *see also Mannke v. Benjamin Moore & Co.,* 375 F.2d 281, 285 (3d Cir. 1967) (citing with approval a jury charge that a release may be set aside in the presence of fraud). Moreover, a party who suffers another's negligent misrepresentation may recover damages thereby occasioned. *Mill-Mar, Inc.,* 278 Pa.Super. at 299, 420 A.2d at 550.

In responding to the defendant's motion for summary judgment, the plaintiffs met their burden of coming forward with evidence which could lead a jury to find clear and convincing proof of fraud and preponderant proof of negligent misrepresenta-

tion. *See, e.g., Roman Ceramics Corp. v. Peoples National Bank,* 714 F.2d 1207, 1215 (3d Cir.1983) (requiring clear and convincing evidence to establish fraud); *Rippee v. Grand Valley Manufacturing Co.,* 762 F.2d 25, 27 (3d Cir.1985) (noting that a preponderance of the evidence is needed to prove negligence). For example, Borden had acknowledged an off-gassing problem with urea-formaldehyde resins generally as early as 1970 when Myron W. Kelly, a former chemist with Borden, published a symposium paper concerning formaldehyde release from particleboard. The plaintiffs introduced the deposition of John Hine, the Western Director of Research and Development for Borden's Adhesives and Chemicals Division, who identified Kelly's paper and further admitted attending a 1971 international colloquium addressing formaldehyde off-gassing. Hine also stated that Borden had received complaints regarding formaldehyde-related health problems from homeowners who purchased Insulspray in 1974 and 1975. Hine reported that formal notice of such complaints eventually reached the Consumer Product Safety Commission.

Such factors apparently occasioned a 1975 internal memorandum by Robert Gutheil, then Adhesives and Chemicals Division Vice-President, calling for a resolution of any potential hazard of formaldehyde release from Insulspray. Gutheil's memorandum, as well, requested Borden's technical personnel to re-examine "whether the [off-gassing] is an application or a product problem." Moreover, the deposition of Borden's Dr. Alfred Cummin[5] suggests that a report by The National Institute of Occupational Safety and Health discussing the harmful effects of formaldehyde came to Borden's attention shortly after its publication in 1976. Borden, in fact, later faced two lawsuits over Insulspray. Nonetheless, Borden concealed all of this information from the Moffatts.

Additionally, Eugene Moffatt testified at his deposition that Borden officials orally and by written materials assured the plaintiffs that Borden had fully tested Insulspray and repeatedly claimed that it was non-toxic and resisted significant shrinkage. In fact, though, it appears from the depositions of Dr. Cummin, Dr. James Williams (the manager of Borden's Louisville Laboratory for Adhesives and Chemicals), and Adhesives and Chemicals Division Manager David Sullivan that Borden conducted only a flammability study of the product. Moreover, Borden supplied the Moffatts with technical data indicating a 1.6% figure of linear shrinkage for Insulspray. Yet, contrary to Borden's other alleged representations, it appears from Dr. Sullivan's deposition that Borden may have lacked the data necessary to assess in-place performance accurately. The plaintiffs accordingly presented evidence that Insulspray's thermal efficiency fell substantially below Borden's estimates.

Finally, Borden's former Executive President Robert Gutheil stated in his deposition that Borden had decided to withdraw Insulspray from the market sometime in the fall of 1978. According to Eugene Moffatt's deposition, however, Borden representatives were simultaneously encouraging the Moffatts to expand their territory into North Carolina. This fact allegedly caused the corporate plaintiff to purchase expensive bulk equipment. A few weeks later the Moffatts received a letter notifying them that Borden would immediately cease Insulspray production.

In sum, we certainly could not, as a matter of law, effectively direct a verdict for Borden on the facts of record. Thus, the district court here erred in holding that the releases in the distributor agreement excused Borden's alleged fraud and misrepresentation and precluded its liability for damages.

5. The present status of Cummin in the Borden organization is unclear in the record. His deposition indicates, however, that until at least 1974 Cummin worked at the management level in Borden's Adhesives and Chemicals Division. Thereafter, he became Technical Director in the corporate offices.

### B.

The plaintiffs also attack the district court's finding that Borden's refusal to continue producing Insulspray, and not the alleged misrepresentations, caused the plaintiffs' damages.

Specifically the district court found:

The allegations of fraud and negligent misrepresentation, even if true are insufficient to overcome the contractual provisions, since the misrepresentations did not alter the fact that Defendant Borden had the legal right to cease production of Insulspray, and the alleged misrepresentations could not have been the cause of Plaintiffs injuries stemming from the nonrenewal of the distributorship agreement.

*Moffatt Enterprises, Inc. v. Borden, Inc.,* No. 82–2536, slip op. at 26 (W.D.Pa. June 20, 1985). Again, however, Pennsylvania law permits a cause of action based upon fraud in the inducement to execute the contract, which is precisely the cause of action here.

The defendant might justify its nonrenewal of the distributor agreement absent the plaintiffs' claims of misrepresentation. Yet the plaintiffs aver that they never would have entered into the contract with Borden had it previously disclosed the alleged defects in Insulspray. As we have explained, the plaintiffs have presented evidence sufficient to support a finding that they justifiably relied to their detriment upon Borden's alleged misrepresentations. This evidence gives rise to material questions of disputed fact not suited for summary judgment.

■ It may be that the defendant had the right, perhaps even a duty, to discontinue production of Insulspray, independent of any contractual provision. That factor may be relevant on the issue of damages but would not bar the plaintiffs' contention of a contract voidable on proof of fraud in the inducement. *Cf. Betz Laboratories, Inc. v. Hines,* 647 F.2d 402, 408 (3d Cir. 1981) (evidence of fraud in the inducement is outside of the parole evidence rule and will render a contract void or voidable at the option of the injured party).

### C.

■ We also find error in the district court's ruling that the Moffatts lacked standing to sue Borden since their alleged injuries arose from harm to Moffatt Enterprises, Inc. To the contrary, the plaintiffs' complaint, besides averring damages to Moffatt Enterprises, Inc., clearly pleads causes of action running to the Moffatts individually.

■ Initially, the district court erred in ruling that the Moffatts' status as shareholders in the corporate plaintiff precluded their separate recovery. In *Davis v. United States Gypsum Co.,* 451 F.2d 659 (3d Cir.1971), the plaintiff alleged, *inter alia,* that the defendants had conspired to defraud Cardinal American, Inc., in which the plaintiff held stock, of its most valuable asset, a distributor agreement granted to it by United States Gypsum Co. Davis averred that Cardinal American's consequent bankruptcy caused him to sustain losses as a guarantor of Cardinal American notes. The district court relied upon a release from the bankruptcy trustee to United States Gypsum to bar Davis's causes of action. We reversed.

We explained:

It is hornbook law that claims asserted for the benefit of stockholders *qua* stockholders in a corporation because of the tortious acts of its officers or those actions in conjunction with them is a class suit, a derivative action, and recovery is for the benefit of the corporation directly and indirectly to its stockholders. It is equally clear that where a corporation, tortiously conspires with others to damage an individual and does so a cause of action arises which belongs to the individual. [Footnotes omitted.] Recovery can then be had by the individual against the corporation.

*Id.* at 662. *Accord K–B Trucking Co. v. Riss International Corp.,* 763 F.2d 1148 (10th Cir.1985) (holding that the sole shareholder of the plaintiff corporation also

qualified as a real party in interest where the defendant allegedly fraudulently induced him to enter various agreements and to form the corporate plaintiff).

Here, the complaint avers that the individual plaintiffs sustained actual and consequential damages including the loss both of funds in developing the corporate plaintiff and Insulattic, Inc., and of their positions at Lockley Manufacturing and Packard Electric. The Moffatts' premise their claims upon, *inter alia*, fraud, misrepresentation, and breach of fiduciary duty. We express no opinion on the merits of any claim. Yet, quite apart from Borden's alleged wrongdoings toward Moffatt Enterprises, Inc., the Moffatt brothers manifestly suffered harm in their individual capacities. We hold, therefore, that the Moffatts may pursue their individual causes of action following remand to the district court.

### D.

■ Finally, we hold that the district court should permit the plaintiffs to amend their complaint following our remand.

After the district court granted summary judgment in favor of Borden, the plaintiffs moved to amend their complaint to assert a RICO claim. The plaintiffs then filed a second amendment, apparently when the court requested separate *ad damnum* clauses for the individual and corporate plaintiffs. The new complaint retained the causes for fraud, misrepresentation, breach of fiduciary duty, and RICO, but dropped the claims for breach of warranty, strict liability, and wrongful termination of the distributor agreement. The district judge, however, summarily denied the plaintiffs' motions.

■ Review of a district court's refusal to permit the filing of an amended complaint generally implicates an abuse of discretion standard. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Heyl & Patterson International, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419, 425 (3d Cir.1981), *cert. denied*, 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982).

Where, as here, the district judge fails to state why he denied the motion to amend, we must determine whether any grounds exist to sustain his decision. *Adams*, 739 F.2d at 863.

The defendant proffers several theories in favor of the district court's actions. But the defendant's arguments presume that the court properly granted summary judgment against the plaintiffs on the merits. In light of our foregoing discussion, then, we find the grant of summary judgment insufficient to support the court's decision. No other reason has been proffered to permit disallowance of an amended complaint.

### IV.

We conclude that the district court erred in holding that the releases in the distributor agreements protected Borden from liability for the fraudulent misrepresentations that allegedly induced the individual plaintiffs in the first instance to enter into those contracts. Moreover, because Borden allegedly fraudulently induced the Moffatts to execute the releases on behalf of the corporate plaintiff, it may, like the individual plaintiffs, recover provable losses caused by Borden's alleged misrepresentations. We also hold that the Moffatts' status as shareholders in the corporate plaintiff cannot preclude their individual causes of action. We, therefore, will reverse the judgment of the district court and reinstate the complaint in its entirety. On remand the district court should permit the plaintiffs leave to amend their complaint.

JAMES HUNTER, III, Circuit Judge, dissenting:

I agree with the majority's conclusions that (a) the releases in the distributorship agreement do not shield Borden from liability for fraud or negligent misrepresentation, and (b) the defendants' allegedly fraudulent representations, not Borden's termination of the distributorship agreement, were the proximate cause of the plaintiffs' alleged injury. Nevertheless, I would affirm the district court's grant of

summary judgment to the appellee. We are free to affirm a grant of summary judgment by the court below on alternative grounds as long as those grounds are supported by the existing record. *See Johnson v. Orr*, 776 F.2d 75, 83 (3d Cir. 1985), *aff'd*, 780 F.2d 386 (3d Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986). I would affirm the district court's grant of summary judgment to the appellee because I believe that the appellants have not demonstrated an ability to prevail on their substantive fraud or negligent misrepresentation claims.

I agree with the majority that summary judgment should be granted only where "no genuine issue as to a material fact remains for trial, and the moving party is entitled to judgment as a matter of law." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Of course, no genuine issue of material fact remains for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby*, — U.S. — – —, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Therefore, when ruling on a summary judgment motion, a judge is instructed by Supreme Court precedent to "view the evidence presented through the prism of the substantive evidentiary burden," *id.*, 106 S.Ct. at 2513, that the parties must bear at trial. Under Pennsylvania law, a plaintiff must present clear and convincing evidence of fraud in order to vitiate the provisions of a written contract. *See Seidman v. American Express Co.*, 523 F.Supp. 1107, 1111 (E.D.Pa.1981). To prevail on a negligent misrepresentation claim, the plaintiff must prove negligence by a preponderance of the evidence. *See Sowizral v. Hughes*, 333 F.2d 829, 833 (3d Cir.1964).

After nearly two years of discovery—the fruits of which fill a seven-volume appendix running over 1200 pages—the plaintiffs in this case have failed to make a showing sufficient to establish—either clearly and convincingly or by a preponderance of the evidence—the existence of the elements necessary to their success on either their fraud or their negligent misrepresentation claims. The Supreme Court has instructed us to enter summary judgment in a case like this, where, "after adequate time for discovery, ... a party ... fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, — U.S. —, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Thus, the motion for summary judgment must be granted for appellee, because appellants are unable to present clear and convincing evidence to support their claim of fraud, or a preponderance of the evidence to support their claim of negligent misrepresentation. *See Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To make out a claim of fraud under Pennsylvania law, the plaintiff must show: "'(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result.'" *Delahanty v. First Pennsylvania Bank*, 318 Pa.Super. 90, 108, 464 A.2d 1243, 1252 (1983). To make out a claim of negligent misrepresentation, the plaintiff must show:

(1) One who, in the course of his business ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Mill-Mar, Inc. v. Statham*, 278 Pa.Super. 296, 299, 420 A.2d 548, 550 (1980), *appeal dismissed*, 499 Pa. 219, 452 A.2d 1017 (1982). Moffatt alleges that Borden misrepresented Insulspray in four factual areas: safety and toxicity, shrinkage, testing, and the future profitability of Insulspray. I find no support for appellants' claims that Borden misrepresented Insulspray in these areas, either intentionally or negligently. I

will consider each of appellants' contentions in turn.

Moffatt alleges that Borden knew Insulspray to be unsafe and toxic. To show that Borden knew of the toxicity problems of Insulspray as far back as 1976, Moffatt points to a December 1976 report by the National Institute of Occupational Safety and Health, which was in Borden's possession, on the possible harmful effects of formaldehyde. This document is totally inconclusive on the subject of the toxicity of urea-formaldehyde foam insulation ("UFFI"), and thus cannot support Moffatt's claim of misrepresentation. Moffatt also points to Borden's receipt of consumer complaints as evidence that Borden knew that Insulspray had adverse health effects on consumers. Borden responds that any adverse health effects that did in fact occur were attributable not to any danger inherent in the product, but to applicator error, which Borden endeavored to correct. Furthermore, the health complaints Borden received were minuscule: in the four years that Borden was in the UFFI business, 46,027 installations of Insulspray were made, and 16 health complaints were received. Nevertheless, Moffatt complains that Borden misrepresented the degree of consumer dissatisfaction by not openly discussing specific consumer complaints—notably, two lawsuits that had been filed against Borden—at the Amelia Island meeting. Borden responds that it did not think such disclosure was necessary, and points out that the topic of handling consumer complaints in general was discussed at length at the conference. Borden cannot be accused of any material nondisclosure of consumer complaints about Insulspray.

Secondly, Moffatt alleges that Borden misrepresented the degree of shrinkage undergone by UFFI after installation. Borden stated in its 1976 marketing literature that the shrinkage rate of UFFI was between 1.6 and 3.8%. Moffatt complains that this was only a linear measure, which did not describe volumetric shrinkage. Borden openly stated that the measure was only linear and made no representation as to volumetric shrinkage, so there is no misrepresentation. Similarly, Moffatt complains that Borden's literature made no mention of the effect of shrinkage on UFFI's R-value (a measure of thermal efficiency), and that the recited R-value was based on a standard that did not take into account in-place performance. Moffatt observes that at the time the R-value representations were made, Borden did not have the data needed to make an accurate assessment of the effect of shrinkage and in-place performance on the measure of Insulspray's thermal efficiency. Moffatt's allegations here show only that the R-value reported by Borden was an inadequate predictor of thermal efficiency; they do not demonstrate any misrepresentation on Borden's part.

Thirdly, Moffatt claims that Borden misrepresented to its distributors that Insulspray had been fully and extensively tested. In fact, the only test performed on Insulspray before Borden withdrew from the market was a flammability study performed in 1976; no toxicology studies were done prior to 1979. Moffatt fails to allege, much less advance proof of, a single misrepresentation by Borden on the topic of testing. In his deposition, Eugene Moffatt testified at length about his repeated—and apparently unavailing—requests that Borden perform various tests. Appendix at 875–83. The Moffatts may believe that Borden was negligent in failing to have Insulspray exhaustively tested prior to putting it on the market, but they have failed to provide any support for their claims of fraud and negligent misrepresentation now under review.

Finally, Moffatt complains that Borden misrepresented Insulspray's profitability and the company's intention to commit itself to long-term production of the product. Moffatt points to Borden's statements at the Amelia Island conference that Borden "was committed to make Insulspray its number one product," that the distributors "would be millionaires in five years," and similar statements to show that Borden misrepresented to the distributors that the company was financially viable. This claim does not merit extensive consideration because such statements constitute nonactionable "pep" talks upon which no rea-

sonable person can rely or consider an objective statement of fact. *See General Electric Co. v. N.K. Ovalle, Inc.*, 335 Pa. 439, 6 A.2d 835 (1939). Plaintiffs were experienced and mature businessmen. They are not defenseless consumers in need of judicial protection from powerful and wily business interests. Plaintiffs chose to enter the business world and play in the major leagues. There is no warrant for the courts to rescue them from their naive and literal interpretation of routine business puffery, such as Borden's "promise" to make all of its distributors millionaires.

A careful examination of the evidence presented to the district court has convinced me that Moffatt cannot prevail on its fraud or misrepresentation claims as a matter of law. Consequently, I would not reach the questions of whether the individual plaintiffs had standing to sue in this case, or whether the district court erred in denying appellants leave to amend their complaint after the court had entered a finding of summary judgment against them. I would affirm the decision of the district court.