548 A.2d 301

**Paul WOODWARD and Patricia Woodward, Husband and Wife, Appellants,**

**v.**

**Raymond DIETRICH and Dorothy Dietrich, Husband and Wife, and Harry L. Smith, t/a R & D Excavating and R & D Tree Service, Appellees.**

Superior Court of Pennsylvania.

Argued Jan. 12, 1988.

Filed Sept. 26, 1988.

112

114

David F. Megnin, Kittaning, for appellants.

John P. Lydon, Pittsburgh, for appellees.

Before OLSZEWSKI, TAMILIA and KELLY, JJ.

KELLY, Judge:

In this case we are called upon to determine whether a party may be held liable for damages proximately resulting from a person's reasonable reliance on fraudulent misrepresentations, despite the fact that such a person had no privity with the party making the misrepresentations and was not specifically intended to rely on the misrepresentations, when the reliance was nonetheless specially foreseeable. We find that such a cause of action may be recognized so long as under the particular circumstances of the case presented the liability to be recognized is not indefinite as to amount, duration or class of prospective plaintiffs.

Appellants, Paul and Patricia Woodward (Woodwards), appeal from the order granting the preliminary objections in the nature of a demurrer made by the appellee, Harry L. Smith, t/a R & D Excavating Service (Smith), dismissing appellants' amended complaint as to Smith (separate counts against Raymond and Dorothy Dietrich (Dietrichs) were unaffected by the order). We reverse the order of the trial court, and reinstate the complaint against Smith.

## I.

■ An order granting preliminary objections in the nature of a demurrer is final and appealable. *See McKinney v. State Farm Mutual Automobile Insurance Co.,* 295 Pa.Super. 319, 441 A.2d 1252 (1982). Our standard of review was set forth in *Vattimo v. Lower Bucks Hosp., Inc.,* 502 Pa. 241, 465 A.2d 1231 (1983) as follows:

All material facts set forth in the complaint as well as all inferences reasonably deducible therefrom are admitted as true [for the purpose of this review.] The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it.

502 Pa. at 244, 465 A.2d at 1232–33 (citations omitted); *see also Mahoney v. Furches,* 503 Pa. 60, 66, 468 A.2d 458, 461–62 (1983). In reviewing the grant of a demurrer we are not bound by the inferences drawn by the trial court nor are we bound by its conclusions of law. *See Drug House Inc. v. Keystone Bank,* 272 Pa.Super. 130, 132, 414 A.2d 704, 705 (1979). Moreover, the novelty of a claim or theory, alone, does not compel affirmance of a demurrer. *See Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979); *Papieves v. Lawrence,* 437 Pa. 373, 376–77, 263 A.2d 118, 120 (1970).

## II.

On June 27, 1986, the Woodwards filed a civil complaint against Smith and the Dietrichs alleging causes of action for intentional, negligent and/or unintentional misrepresentations and breach of warranty. The Woodwards alleged that their basement had been flooded and damaged two years after they purchased their home from the Dietrichs because either or both of the defendants (the Dietrichs or Smith) had fraudulently misrepresented and concealed the fact that the grey water sewage sewer connection had not been completed by Smith in the manner indicated in the township records and communicated to the Woodwards by

the Dietrichs during their negotiations relating to their purchase of the Dietrichs' residence. Because this pleading was later amended, it is unnecessary for us to review the specific averments made therein.[1]

Preliminary objections in the nature of a demurrer were filed by Smith on November 12, 1986, and a brief in support of the objections was filed on December 2, 1986. In his brief, Smith summarized the grounds of his preliminary objections as follows:

Defendant Smith has filed these Preliminary Objections in the nature of a demurrer to the Complaint alleging that the plaintiffs have failed to state facts constituting a cause of action against him because:

1. The facts as stated establish that defendant Smith owed no duty to the plaintiffs which he could have violated;

2. Plaintiffs have not alleged a cause of action for fraud or fraudulent misrepresentation;

3. The Complaint does not state the material facts upon which the cause of action is based;

4. No facts establishing causation between the harm suffered by the plaintiffs and any breach by the defendant is shown; and

5. The plaintiffs are not in privity with defendant Smith.

(Smith's Brief 12/2/86 at 3; R.R. at 53a).

The Woodwards' Answer to the preliminary objections was filed December 8, 1986, and a brief in opposition to the objections was filed December 23, 1986. The Woodwards responded that the complaint averred that the damages alleged were incurred as the result of Smith's camouflaged non-installation of the proper sewer connections and the Dietrichs' subsequent intentional or negligent misrepresentations to the Woodwards concerning the sewer connections. The Woodwards further responded that a legal basis

---

1. We note that on September 9, 1986, default judgment was taken against Smith. This judgment was opened by order dated October 20, 1986. Though contested in the trial court on procedural grounds, no appeal was taken from the order opening the default judgment. We express no opinion as to the propriety of the order opening judgment.

for a cause of action against Smith existed, "under Restatement of Torts, 2d, Sections 531, 532, 533, 536, the logic of *Mill–Mar, Inc. v. Statham*, 278 Pa.Super. 296, 420 A.2d 548 (1980), and well-established general case law regarding fraud...." (Woodwards' Brief 12/23/86 at 6).

On January 23, 1987, the trial court granted Smith's preliminary objections and gave the Woodwards leave to file an amended complaint within twenty (20) days. In response to a request for clarification by the Woodwards' attorney on January 26, 1987, the trial court wrote a letter to the parties dated January 27, 1987, which explained:

> The intent of my Order was to dismiss the Complaint as to Smith on the theory of liability which you had asserted. I held that there could be no liability to the Plaintiffs by Smith inasmuch as there was no contractual relationship between them, no privity, and that the section of the Restatement which you cited was inapplicable.
>
> At your request, I granted leave to file an amended complaint on the chance that you had some other theory of liability. If you're simply reasserting the same type of liability, I would suggest that the same Preliminary Objections will be filed, and the same Order from this Court will be entered. In other words, unless you have some other theory of liability, I would not suggest filing an amended Complaint as to Smith.

(Trial Court Letter 12/27/87; R.R. at 108a, 116a).

The Woodwards filed their amended complaint on February 11, 1987. Because it is from the demurrer to that pleading that appeal is taken, close review of the averments of the amended complaint (under the standard cited in Part I, *supra*) is required. The averments of the amended complaint and reasonable inferences derivable therefrom allege the following factual scenario.

The regulations of the Municipal Authority of Allegheny County require the disposal of all "black water" and "gray water" sewage through the Municipal Authority's sanitary sewer system. (Amended Complaint at I, 6; R.R. at 80a). In September of 1978 an inspector for the Municipal Au-

thority prepared a sketch of the lateral sewer lines which the Dietrichs were to install to connect their home to the sanitary sewer system. (Amended Complaint at I, 5; Exhibit 2; R.R. at 80a, 94a). On April 17, 1979, the Dietrichs were given notice that they were required to acquire a permit, to complete the connection of the house to the sewer system in accordance with the Municipal Authority's sketch and applicable regulations, and to begin using the sanitary sewer system within sixty (60) days. (Amended Complaint I, 5; Exhibits 3 & 4; R.R. at 79a–90a, 95a–97a).

By April 30, 1979, the Dietrichs had contracted with Smith to make the sewer connection for them and had secured the necessary permit to begin work on the connections. (Amended Complaint at I, 5, 7; Exhibit 4; R.R. at 80a, 97a). Smith completed his work in May or June of 1979 and was paid in full by the Dietrichs. (Amended Complaint at I, 7; Exhibit 5; R.R. at 80a, 98a).

Smith did not, however, complete the connections in accordance with the Municipal Authority's sketch, which required two sewer lines, one for "black water" sewage produced by the commodes and another for the "gray water" sewage produce by all the other plumbing fixtures in the house. Rather, Smith installed only the black water sewage connection line, and left the gray water sewage line connected to the existing terra cotta sewer. In order to camouflage his non-installation of the gray water connection line, Smith installed a standpipe and a clean-out pipe in the old terra cotta line. (Amended Complaint at I, 7; R.R. at 80a–81a).

Smith contacted the Municipal Authority on behalf of the Dietrichs and sought approval of the sewer connections. Though Municipal Authority regulations required that connections be left uncovered until they were inspected, Smith's work may or may not have been properly inspected. In either case, Smith improperly gained approval of work which was not in accordance with the Municipal Authority's connection sketch. Approval was given orally and noted in

the Municipal Authority's records. (Amended Complaint at I, 8; R.R. at 81a).

On August 8, 1983, the Woodwards purchased the Dietrichs' residence. (Amended Complaint at I, 4; R.R. at 79a). Prior to purchasing the Dietrichs' residence, the Woodwards specifically asked the Dietrichs about the sewer system. The Dietrichs assured the Woodwards that the sewer system was in compliance with Municipal Authority requirements and provided the Woodwards with various documents which purported to establish that the sewer connections had been installed in accordance with the sketch drawn by the Municipal Authority's inspector. (Amended Complaint at I, 9; Exhibits 2–5; R.R. at 81a–82a, 94a–98a). The Woodwards relied upon the Dietrichs' representations regarding the condition of the sewer connections, the approval of the connections by the Municipal Authority, and the skill, competence, and integrity of Smith. (Amended Complaint at I, 10; R.R. at 82a).

In July 1985, a clogged drain caused basement flooding in the Woodwards' residence on two occasions resulting in $2,165.00 worth of property damage.[2] Following the second incident, the Woodwards excavated a portion of the gray water sewage line and thereby discovered Smith's camouflaged non-installation of the gray water sewage connection line. The flooding had been caused by blockage in the old terra cotta sewer line, thus, was proximately caused by the failure to install the gray water sewage connection to the sanitary sewer system. (Amended Complaint at I, 11–12; R.R. at 82a–83a).

The Woodwards expended $2,024.09 to properly connect the gray water sewage line to the sanitary sewer system, and also expended 289 hours of personal labor worth $15.00 per hour. From the time they purchased the house to the time they finally connected the gray water sewage line to the sanitary sewer the Woodwards paid $823.24 for sewer services which they did not fully enjoy as the result of the

2. The Woodwards aver that the clogged drain could not be relieved by use of a mechanical snake, an electric eel or pressurized water.

lack of a gray water sewage connection. (Amended Complaint at I, 12; R.R. at 83a).[3]

Because the pleading of the theory of liability is critical to our disposition of this appeal, we set forth that portion of the amended complaint *verbatim:*

13. Smith intentionally worked a fraud on Woodwards, who, as the subsequent owners and occupants of the residence, were members of the class of persons whom he had reason to expect would act in reliance on his misrepresentations. This fraud was worked, *inter alia,* by Smith's camouflaging the non-installation of the 'gray water' lateral sewer line, by his role in securing approval of the lateral sewer line installation which did not include connection of the 'gray water' sewer line to the sanitary sewer main line, which approval was filed with the records of the Municipal Authority as required by its ordinances and regulations and by his participation in, if not orchestration of, the scheme set forth in paragraphs 1 through 12. Furthermore, in the event that Dietrichs were, in fact, unaware of the actual manner of Smith's installation of the lateral sewer lines, Smith misrepresented to Dietrichs, as well as the Municipal Authority, the actual manner of his installation of the lateral sewers, and he had reason to know that his misrepresentations to Dietrichs and the Municipal Authority regarding his camoflaged [sic] non-installation of the 'gray water' lateral sewer line and his improper obtaining of Municipal Authority approval would in substance be repeated to the subsequent owners and occupants of the residence who would act in reliance thereon.

(Amended Complaint at I, 13; R.R. at 84a). The Woodwards seek compensatory and exemplary damages in excess of $10,000, together with an award for counsel fees and

3. The Woodwards also aver that they have incurred unspecified but significant counsel fees and have suffered great aggravation and trauma. No dollar amounts are specified in the pleadings for these damages.

costs.[4]

Preliminary objections in the nature of a demurrer were again filed by Smith on March 5, 1987, and a brief in support of the objections was filed March 19, 1987. Smith argued that the amended complaint did not meet the objections raised to the prior complaint and therefore the demurrer should again be sustained based upon the "law of the case" as embodied in the trial court's letter explaining the grant of the prior demurrer.

The Woodwards filed their answer to the objections on March 23, 1987, and a brief in opposition to the objections on May 22, 1987. The Woodwards responded that the amended complaint met the prior objections and properly stated a valid cause of action against Smith. The Woodwards' brief simply incorporated by reference its prior brief.

The preliminary objections were sustained on May 26, 1987. The opinion of the trial court explained the grant of the demurrer to the amended complaint as follows:

The Defendant, Harry L. Smith, t/a R & D Excavating and R & D Tree Service (hereinafter 'Smith') constructed a sewer system in a residence then owned by Raymond Dietrich and Dorothy Dietrich, his wife. Subsequently, Dietrichs sold the property to the Plaintiffs. Plaintiffs had no contract with Smith, no privity with him, and were not the owners of the property at the time Smith performed his work, all according to the Complaint. The contention of the Plaintiffs is that Smith committed a fraud upon Dietrichs and any subsequent owners of the property, since he knew, or should have known, that Dietrichs would some day convey the property to others. In the Amended Complaint, paragraph 13 states 'Smith intentionally worked a fraud on Woodwards, who, as the subsequent owners and occupants of the residence, were

4. The remainder of the amended complaint is not particularly relevant to the disposition of this appeal. We note that it asserts claims against the Dietrichs based upon the above averments for intentional misrepresentation, negligent misrepresentation, unintentional misrepresentation and breach of warranty.

members of the class of persons whom he had reason to expect would act in reliance on his misrepresentations.' Counsel for plaintiffs cites *Mill–Mar, Inc. v. Statham,* 278 Pa.Super. 296, 420 A.2d 548 (1980) and Section 552 of the Reinstatement of Torts 2d.

This Court is still of the opinion that the Amended Complaint fails to set forth facts to bring the matter within the ambit of Section 552 of the Reinstatement or the *Mill–Mar* holding. Section 552 makes it clear that the liability established therein is limited to loss suffered by the person whose benefit and guidance the Defendant intends to supply the information or knows that the recipient intends to supply it and the loss suffered must come through reliance upon the information in a transaction that the Defendant intends the information to influence or knows that the recipient so intends the information to influence. In the present case there are no allegations that the Defendant Smith provided the information for the Plaintiffs' benefit and guidance or that he knew Defendant Dietrichs would supply the information to the Plaintiffs. Further, there is no allegation that Smith provided the information in a transaction that he intended this information to influence, namely the sale from Dietrichs to Woodwards.

Accordingly, the Amended Complaint is still defective, and must be dismissed as to Defendant Smith.

(Trial Ct.Op. at 1–2; R.R. at 125a–126a). The Woodwards filed a timely notice of appeal, the issues have been briefed and argued, and the matter is now properly before us for disposition.

## III.

Fraud consists of anything calculated to deceive whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look, or gesture. *See Frowen v. Blank,* 493 Pa. 137, 143, 425 A.2d 412, 415 (1981); *In re Thorne's Estate* 344 Pa. 503, 511 n. 2, 25 A.2d 811, 816 n. 2 (1942). Traditionally, in order

to state a cause of action for fraud, the plaintiff was required to establish:

(1) a misrepresentation;

(2) a fraudulent utterance thereof;

(3) an intention by the maker that the recipient will thereby be induced to act;

(4) justifiable reliance by the recipient upon the misrepresentation;

(5) damage to the recipient as the proximate result.

See *Pittsburgh Nat'l Bank v. Larson*, 352 Pa.Super. 250, 507 A.2d 867 (1986), *quoting Delahanty v. First Pennsylvania Bank*, 318 Pa.Super. 90, 108, 464 A.2d 1243, 1252 (1983).

The Woodwards have alleged that the non-installation of the gray water sewer connection was fraudulently concealed by Smith, and that both the Dietrichs and Smith were responsible for misrepresentations made by the Dietrichs at the time the Woodwards bought the house from the Dietrichs. The Woodwards have also alleged that they reasonably relied on the misrepresentations made relating to the sewers in purchasing the Dietrichs' house and that they incurred substantial damages proximately caused by the concealed non-installation of the gray water sewage sewer connection. We find that the Woodwards have made sufficient averments with respect to the first, second, and fifth elements of fraud to withstand demurrer.

The trial court, however, construed the Woodwards' complaint as attempting to state a cause of action against Smith for negligent misrepresentation under Restatement of Torts 2d Section 552. The trial court found that the Woodwards' complaint against Smith was deficient in that it had failed to allege that Smith *intended* to cause the Woodwards to rely on his concealment of the non-installation of the gray water sewer connection and the misrepresentations made to others relating thereto. We cannot agree with the trial court's characterization of appellant's theory of liability. Moreover, we find that the trial court's mischaracterization of the Woodwards' theory of liability resulted in the applica-

tion of an incorrect standard in determining whether the pleadings alleged a valid cause of action.

## A.

■ Initially we note that the trial court is incorrect in stating that, "Counsel for plaintiffs cites *Mill–Mar, Inc. v. Statham*, 278 Pa.Super. 296, 420 A.2d 548 (1980) and Section 552 of the Restatement of Torts 2d," in support of its claim against Smith. (Trial Ct.Op. at 2). Careful review of the record reveals that Woodwards' counsel never cited Section 552. Rather, counsel specifically argued Smith's misrepresentation and concealment of his non-installation of the gray water sewage sewer connection line was done knowingly and intentionally and that, "under Restatement of Torts, 2d, Sections 531, 532, 533, 536, *the logic of Mill–Mar, Inc. v. Statham*, 278 Pa.Super. 296, 420 A.2d 548 (1980), and well-established general case law regarding fraud, there is a clear legal basis for Woodwards' claim against Smith." (Woodwards' Brief 12/23/86 at 6).

The error in the trial court's characterization of the Woodwards' theory of liability is significant. Restatement of Torts 2d, Section 552 provides:

**§ 552. Information Negligently Supplied for the Guidance of Others**

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, *if he fails to exercise reasonable care or competence in obtaining or communicating the information.*

(2) Except as stated in Subsection (3), *the liability stated in Subsection (1) is limited to loss suffered*

(a) by the person *or one of a limited group of persons for whose benefit and guidance he intends to supply the*

*information or knows that the recipient intends to supply it;* and

(b) through reliance upon it in a transaction that *he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.*

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

(Emphasis added). Seizing upon the limitations on liability expressed in subsection 2, the trial court reasoned that the Woodwards' complaint against Smith was deficient.

 We need not determine whether the trial court's application of sub-section 2 to the pleadings was correct, because we find that Section 552 as a whole does not apply. The Woodwards' complaint unequivocally asserted a claim against Smith for "fraudulent" rather than "negligent" misrepresentation.[5] The Woodwards assert that Smith's concealment of the non-installation and subsequent misrepresentations to governmental authorities (and possibly the Dietrichs) could not have been anything but knowing and intentional. (Woodwards' Brief 12/23/86 at 3). Section 552 applies only to claims of negligent misrepresentations and not fraudulent misrepresentation; hence, the trial court's reliance on the limits on liability expressed in sub-section 2

5. A "negligent" misrepresentation is a misrepresentation which arises from a want of "reasonable care or competence in obtaining or communicating information," as opposed to a "fraudulent" misrepresentation which involves either a "knowing" or a "reckless" communication of a misrepresentation. *Compare Restatement of Torts 2d* Section 526 and *Restatement of Torts 2d* Section 552. Though the Woodwards characterize Smith's actions as "intentional" misrepresentation, we find that the Woodwards claim is actually that Smith made "fraudulent" misrepresentations. A misrepresentation is unquestionably "fraudulent" when the representer knows that the matter is not as it is represented to be, which is precisely what the Woodwards allege Smith has done. *See Restatement of Torts 2d,* Section 526(a) and Comment (c). Reference to "intent" in this context would confuse the scienter and scope of liability questions. For this reason we will use the Restatement terminology throughout.

of Section 552 was misplaced.[6]

## B.

The Woodwards cited, as authority for their theory of Smith's liability, Restatement of Torts 2d Sections 531, 532, 533 and 536. Section 531 provides:

§ **531. General Rule**

One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends *or has reason to expect* to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

**Caveat:**

The Institute expressed no opinion on whether the liability of the maker of a fraudulent representation may extend beyond the rule stated in this Section to other persons or other types of transactions, if reliance upon the representation in acting or in refraining from action may reasonably be foreseen.

(Emphasis added). The comments to this section explain that when the misrepresentation is *fraudulent* rather than *negligent* the scope of liability is expanded to include not only those "intended" [7] to rely on the deceit but also those whom the party making the misrepresentation has special "reason to expect" may reasonably rely on the misrepresen-

6. We note that while *Mill–Mar, Inc., supra,* involved a negligent misrepresentation claim under Section 552, we do not construe the Woodwards' reference to "the logic of *Mill–Mar, Inc.,*" to imply characterization of the Woodwards' claim as arising under Section 552. Rather, we interpret the reference as relating only to the general discussion of the erosion of the privity requirement in *Mill–Mar, Inc.,* 278 Pa.Superior Ct. at 299–300, 420 A.2d at 550–51.

7. A result is deemed to be "intended" if "the actor either acts with the desire to cause it, or acts believing that there is a substantial certainty that the result would follow from his conduct." *Restatement of Torts 2d,* Section 531, comment c.

tation,[8] which may include a large group or class of persons such as "all prospective buyers." [9]

8. "Reason to expect" is defined in *Restatement of Torts 2d* Section 531, Comment d as follows:

> d. 'Reason to expect.' One has reason to expect a result if he has information from which a reasonable man would conclude that the result will follow or would govern his conduct upon the assumption that it will do so.
>
> In order for the maker of a fraudulent misrepresentation to have reason to expect that it will reach third persons and influence their conduct it is not enough that he recognizes, or as a reasonable man should recognize, the risk that it may be communicated to them and they may act upon it....
>
> Virtually any misrepresentation is capable of being transmitted or repeated to third persons, and if sufficiently convincing may create an obvious risk that they may act in reliance upon it. (See Illustrations 1 to 3, above). This risk is not enough for the liability covered in this Section. *The maker of the misrepresentation must have information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct.* There must be something in the situation known to the maker that would lead a reasonable man to govern his conduct on the assumption that this will occur. If he has the information, the maker is subject to liability under the rule stated here.

(Emphasis added). Sections 532 and 536, cited by the Woodwards, are particular illustrations of the *special foreseeability* rule. Of the two sections, Section 536 is the more applicable to the instant case. The written documents upon which the Woodwards base the *special foreseeability* of their reliance were not "muniments of title" or "similar commercial documents" (Section 532); however, at least some of those documents (Exhibits 2–4; R.R. at 94a–97a) were generated pursuant to local ordinances and arguably fall within the scope of Section 536 which provides:

**§ 536. Information Required by Statute**

If a statute requires information to be furnished, filed, recorded or published for the protection of a particular class of persons, one who makes a fraudulent misrepresentation in so doing is subject to liability to the persons for pecuniary loss suffered through their justifiable reliance upon the misrepresentation in a transaction of the kind in which the statute is intended to protect them.

Comment h to this section states that, "[t]he rule stated in this Section includes administrative regulations and other governmental orders issued pursuant to a statute."

9. Comment (e) provides in pertinent part:

> e. Class of persons. The maker may have reason to expect that his misrepresentation will reach any of a class of persons, although he does not know the identity of the person whom it will reach or indeed of any individual in the class....

■ The Woodwards argued that the foregoing Sections supported their claim against Smith in that:

Smith and Dietrichs had a contract regarding installation of the lateral sewer lines for the residence which Dietrichs later contracted with Woodwards for sale thereof. It is manifestly impossible that, when approval of the installation was secured, Smith was unaware of either the condition of the lateral sewer line, including the camouflage of the new stand pipe and clean-out pipe in the old terra cotta line, or the regulations of the Municipal Authority governing such installations. What is not clear at this point in the litigation is whether Dietrichs were witting or unwitting parties to the secondary fraud worked upon the Municipal Authority in securing approval of the camouflaged non-installation of the 'gray water' lateral sewers, but there is no question that misinformation regarding the condition of the lateral sewer was recorded with the Municipal Authority.

If Dietrichs were witting participants, then clearly Dietrichs and Smith were both part of the conspiracy to defraud, and the actions of Dietrichs in furtherance of that conspiracy must be charged against Smith. If Dietrichs were unwitting participants, there is absolutely no

> The class may include a rather large group, such as potential sellers, buyers, creditors, lenders or investors, or others who may be expected to enter into dealings in reliance upon the misrepresentations.

(Emphasis added). Section 533, also cited by the Woodwards is a special application of this rule. Section 533 provides in pertinent part:

**§ 533. Representation Made to a Third Person**

The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends *or has reason to expect that its term will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.*

**Caveat:**

The Institute expresses no opinion on whether the liability of the maker of a fraudulent representation may extend beyond the rule stated in this Section to other persons or other types of transactions, if reliance upon the representation in acting or refraining from action may reasonably be foreseen.

legitimate rationale why Smith, the perpetrator of an intentional fraud, should be insulated from liability for the resulting injury because Dietrichs did not discover Smith's fraud before they sold it to Woodwards.

It is the case that Smith and Woodwards were not in strict privity; however, the importance of privity has been steadily eroded. *Clearly, Woodwards, the subsequent owners of the residence, were within the foreseeable class of persons who would be injured by Smith's camouflaged non-installation of the lateral sewer lines for that residence. Moreover, information regarding the installation of sewer systems recorded with the Municipal Authority was clearly required, and Smith was a party to the recording of the misinformation upon which Woodwards relied to their pecuniary loss.* (Woodwards' Brief 12/23/86 at 3–4; R.R. at 70a–71a). (Emphasis added).

The Woodwards' complaint against Smith was not based upon Restatement of Torts 2d Section 552. Consequently, we must reject the trial court's reasons for sustaining Smith's demurrer.

## IV.

Though we have rejected the trial court's reasons for sustaining the demurrer, we have not yet answered the question of whether the Woodwards have stated a valid cause of action for fraudulent misrepresentation against Smith. We find that resolution of this question requires a two part analysis: first, we must determine the degree of foreseeable and reasonable reliance alleged, and then we must decide whether liability for fraudulent misrepresentation may be predicated upon such foreseeable reasonable reliance.

## A.

■ The Woodwards have alleged that their reliance was reasonable and specially foreseeable.

The Woodwards allege that they actually relied on misrepresentations relating to the concealed grey water sewage sewer connections. This is a sufficient allegation of "reasonable" reliance. Sewer connections are subterranean fixtures which materially affect the value of a home. They are expected to have an extended useful lifetime. Though they are important to any prospective home buyer, sewer connections are not by their nature open to inspection. Instead, prospective home buyers must ordinarily rely upon representations made by the sellers and any confirmatory documentation available. *See Wolfe v. Arrott*, 109 Pa. 473, 1 A. 333 (1885) (lessee reasonably relied to his detriment on misrepresentations made by the landlord regarding the conditions of the sewers and drains and was permitted to recover damages resulting from the reliance); *Mancini v. Morrow*, 312 Pa.Super. 192, 458 A.2d 580 (1983); *Shane v. Hoffman*, 227 Pa.Super. 176, 324 A.2d 532 (1974): *generally* Annotation, *Fraud Predicated Upon Vendor's Misrepresentation or Concealment of Danger or Possibility of Flooding or Other Unfavorable Water Conditions*, 90 ALR 3d 568 (1979 & 1987 Supp.); Annotation, *Real Estate Broker's Liability to Purchaser for Misrepresentation or Non-disclosure of Physical Defects of Property Sold*, 46 ALR 4th 546 (1986 & 1987 Supp.).

The Woodwards alleged that as potential subsequent purchasers their reliance was specially foreseeable. In our present mobile society, estates in land are transferred freely and regularly. Thus, while Smith may not have known that the Dietrichs would sell their home, the possibility of such a sale during the useful lifetime of a sewer connection was certainly quite foreseeable. *Cf. Barnhouse v. City of Pinole*, 133 Cal.App.3d 171, 193, 183 Cal.Rptr. 881, 894 (1982) (the sale of a home to a subsequent purchaser was certainly foreseeable); *Terlinde v. Neely*, 275 S.C. 395, 271 S.E.2d 768, 770 (1980) (the sale of a home to a subsequent purchaser was clearly foreseeable). If, as alleged, Smith had concealed the non-installation of the grey water sewage connection from the Dietrichs, Smith would have had special reason to foresee that any subsequent purchaser would be

unaware of the material latent defect Smith allegedly concealed.

Moreover, the Woodwards alleged that Smith, either with or without the Dietrichs' knowledge, made misrepresentations to the Municipal Authorities relating to the non-installation of the gray water sewage sewer connections. The Woodwards contend that the documents generated by Smith's alleged fraudulent procurement of governmental approval of the concealed non-installation of the gray water sewage sewer connection would also increase the foreseeability of a subsequent purchaser's reliance upon the misrepresentations relating to the concealed non-installation of the sewer connection. *See Handy v. Beck,* 282 Or. 653, 581 P.2d 68 (1978) (the fraudulent procurement of governmental approval of water well seals and casings, which had concealed defects, supported finding of special foreseeability under Restatement of Torts 2d § 536).

Based upon reasonable inferences derivable from the pleadings, we conclude that the Woodwards' have alleged specially foreseeable reasonable reliance upon Smith's misrepresentations.

## B.

Next, we must consider whether a contractor may be held liable for damages caused by the fraudulent concealment of the non-installation of grey-water sewage sewer connections and misrepresentations incurred by a subsequent purchaser of the home despite the absence of privity or specific intent by the contractor to induce the subsequent purchaser's reliance, if the subsequent purchasers reliance was nonetheless specially foreseeable. Upon review of the relevant case law, we are persuaded that contractor may be held liable under the facts alleged in the instant case. Our reasoning follows.

### 1.

The traditional scope of liability for misrepresentation was explained by the Professor Cooley in 1880 as follows:

Who may rely upon the Misrepresentations. *No one has a right to accept and rely upon the representations of others but those to influence whose action they were made.* If everyone might take up and act upon any assertion he heard made or saw in print as one made for him to act upon, and the truth of which was warranted by the assertor, the ordinary conversation of business and of society would become unsafe, and the customary publication of current news, or supposed news, would only be made under the most serious pecuniary responsibility. *Cooley on Torts,* at 493–94 (1880). (Emphasis added). *See also* Reed, *Derry v. Peek and Negligence,* 8 J. Legal History 64 (1987) (tracing the history and development of the common law action for deceit/misrepresentation). In 1923, Justice Simpson summarized Pennsylvania law on this issue as follows:

'The false statement must have been made for the purpose of being acted upon either by the person to whom it was made, or by some third person *who it can be reasonably said was within the contemplation of defendant and to whom the statement was intended to be communicated.* Representations made for a different purpose, or intended for persons other than plaintiff cannot be made the basis of an action of deceit': 20 Cyc. 35. 'It is well settled that where a false statement is made to the public at large for the purpose of influencing the action of any individual to whom it may be communicated, any person acting in reliance upon it and thereby sustaining injury may maintain an action against the person who made it, and that in such case it is not necessary that there should be an intent to defraud any particular person; but in such cases the representation must of course have been intended for the public'; 20 Cyc. 81–2.

*Gillespie v. Hunt,* 276 Pa. 119, 126–27, 119 A. 815 (1923). (Emphasis added). Though the language "who it can be said was reasonably within the contemplation of the defendant" is comparable to the "reason to expect" language of *Restatement of Torts 2d,* Section 531, that language is

clearly restricted by the subsequent qualifying phrase, "and to whom the statement was intended to be communicated." The intent requirement in *Gillespie* is obviously more restrictive than the "reason to expect" requirement of Section 531.

We note, however, that privity between the plaintiff and defendant was not required to maintain an action for deceit under the traditional standard. *See e.g. Jamestown Iron & Metal Co. v. Knofsky*, 291 Pa. 60, 139 A. 611 (1927) (one who makes false statements to another intending to induce them to give credit to a third person is liable for deceit, despite an absence of privity between those parties); *Rheem v. The Naugatuck Wheel Co.*, 33 Pa. 358 (1859) (same); *See also Sacks v. Schimmel*, 3 Pa.Super. 426 (1897) (wife could sue landlord for deceit where misrepresentations were made to husband *and wife* and landlord knew husband *and wife* were to operate joint business on the property, even though only the husband signed the lease). From 1927 to the present, however, appellate courts in Pennsylvania have not had occasion to apply or reconsider the scope of liability for fraudulent misrepresentation as it relates to third parties.

## 2.

The absence of more recent case law is significant in light of the considerable change which has occurred in this area of the law in the intervening years. The changes are summarized in *Prosser and Keaton on the Law of Torts*, Ch. 18, § 107 at 743–45 (5th ed. 1984) as follows:

Once the intent to mislead is established, troublesome questions arise as to the persons to whom the representer will be liable.

In the leading English case of *Peek v. Gurney*, [6 Eng & Ir.App. 377 (L.R.1873)] in which the directors of a corporation issued a prospectus for the purpose of inducing the public to purchase stock from the company itself, it was held that there was no liability to an investor who bought his stock on the market from a stockholder. The court

limited responsibility to those whom the defendants had desired to influence, in the manner which had occasioned the damage.

The doctrine of transferred intent, which has been applied in the case of personal violence intended for one person which injures another, was thus rejected in the case of misrepresentation, for the obvious reason of policy that the class of persons who may conceivably learn of a misstatement and be influenced by it is so enormous that an impossible burden, likely to be out of all proportion to the fault involved, might be cast upon anyone who makes a false assertion.

\* \* \* \* \* \*

The limitation thus imposed must, however, be qualified to a considerable extent. The class of persons whom the speaker desires to influence may of course be a very large one, as where he publishes a statement in a newspaper intending to reach a whole class of purchasers or investors, or furnished information to a credit agency in the expectation that it will be passed on to those with whom he may deal, or where a manufacturer advertises his goods to possible consumers. A statement may be intended to be directed to others in addition to the immediate recipient, as where an auditor's report is prepared to be exhibited to the plaintiff, or information is given to a promoter for the purpose of inducing action by the corporation to be formed.

*But apart from such cases, there is a very definite tendency to depart from the old position, and to extend liability to those whom there is no desire to influence, but whose reliance upon the representation there is some special reason to anticipate.* This has been almost a matter of necessity where the representation is embodied in a document, such as a negotiable instrument, a bill of lading, a deed, or a stock certificate, or even an article of commerce of a kind customarily relied upon by third persons; and likewise, of course, where a statute enacted for the protection of a particular class of persons requires the information to be published or filed. Beyond this, the

same result sometimes has been reached by finding that that was 'intended' which was merely specially foreseeable; and in a few cases by holding outright that it is enough that the defendant should have contemplated the plaintiff's reliance. *The limitation to a 'desire' to influence the plaintiff seems clearly too narrow, and there is much merit in the contention that, while the defendant is not required to investigate or otherwise guard against the possibility that his statement may come in to the hands of strangers and affect their conduct, his responsibility should at least extend to those who might reasonably be expected to assume from appearances that the representation was intended to reach them* (Footnotes collecting cases and authorities omitted) (emphasis added). *See also* Prosser, *Misrepresentation and Third Persons,* 19 Vand.L.R. 231, 231–55 (1966). As noted *supra,* the *Restatement of Torts 2d* adopts the expanded scope of liability discussed above. *See Restatement of Torts 2d* §§ 531, 532, 533, & 536.

### 3.

May we embrace the expanded scope of liability for fraudulent misrepresentation set forth in *Restatement of Torts 2d,* despite the restrictive holding in *Gillespie v. Hunt, supra?* The doctrine of *stare decisis* has been cogently described as follows:

A deliberate or solemn decision of a court or judge, made after argument on a question of law fairly arising in a case, and necessary to its determination, is an authority, or binding precedent, in the same court or in other courts of equal or lower rank, in subsequent cases where 'the very point' is again in controversy; but the degree of authority belonging to such a precedent depends, of necessity, *on its agreement with the spirit of the times or the judgment of subsequent tribunals upon its correctness as a statement of the existing or actual law, and the compulsion* or exigency of the doctrine is, in the last analysis, moral and intellectual, rather, than arbitrary or inflexible.

Chamberlain, *Stare Decisis* at 19 (1885), *cited in* Von Moschicker, *Stare Decisis, Res Judicata, and Other Selected Essays,* at 1 (1929). (Emphasis added). If the restrictive rule of *Gillespie* had been considered or applied in recent years we would have no choice but to abide by the law as announced in that case, regardless of our views as to the wisdom of that decision. The doctrine of *stare decisis* and appropriate deference to the superior authority of our Supreme Court would dictate such action. However, for the past sixty years no appellate cases in Pennsylvania have addressed this issue.

We find that the authority of *Gillespie* has been erroded by time, by the persuasive criticism of ,its limitations by other courts and commentators, and by the spirit of the times. Nonetheless, we would remain reluctant to exceed the bounds of a decision of our Supreme Court even as old and as questionable as *Gillespie,* if it were not for the fact that subsequent Pennsylvania Supreme Court decisions in analogous cases convince us that *Gillespie* remains precedent because of the lack of an appropriate opportunity to reconsider *Gillespie,* and not a lack of inclination to do so.

Under our early case law, a contractor's liability for defects in the construction was limited to the persons in direct privity with the contractor; the contractor was fully absolved from liability to third persons for injuries caused by even latent defects upon delivery and acceptance of possession of the realty. *See e.g. Congregation v. Smith,* 163 Pa. 561, 30 A. 279 (1894) (contractor not liable to property owner for damages caused by latent defects in sewer lines installed on property owner's property, as municipality had resumed possession of the sewers); *Curtin v. Somerset,* 140 Pa. 70, 21 A. 244 (1891) (contractor not liable to guest for injuries resulting from the collapse of a porch caused by the contractor's gross departures from building specifications in the construction contract, as hotel had resumed possession and accepted the work). The rationale for the privity requirement in negligent construction cases, set forth in *Curtin v. Somerset,* was virtually the same as

that given for the intent requirement in deceit actions by Professor Cooley, *i.e.* that without the privity or intent requirements indefinite liability disproportionate to fault could result, and that legitimate business interests would be jeopardized by the threat of such liability. *Compare Curtin v. Somerset, supra,* 140 Pa. at 78–80, 21 A. 244, and *Cooley on Torts, supra,* at 493–94.

The privity requirement of earlier caselaw was first eroded and then fully abandoned by our Supreme Court. In *Grodstein v. McGiven,* 303 Pa. 555, 154 A. 794 (1931), the Court recognized a general exception to the strict privity rule for those whom the contractor should expect, that in the natural course of things, would also be brought into contact with or use the defective article or structure. In *Grodstein,* damages for injuries sustained by a wife, caused by a defective porch railing installed by the contractor for her husband, were deemed to be recoverable even though there was no privity between the wife and the contractor. *Cf. Sacks v. Schimmel, supra.*

In *Foley v. Pittsburgh–Des–Moines Co.,* 363 Pa. 1, 68 A.2d 517 (1949) our Supreme Court explained:

In Pennsylvania the earlier cases (*Curtin v. Somerset,* ...), adopted the then prevailing doctrine, but, if not actually overruled, they have at least been discarded as the controlling authorities and all the more recent cases in this Commonwealth have followed the principles proclaimed in *MacPherson v. Buick Motor Co.* [217 N.Y. 382, 111 N.E. 1050 (1931)], *Grodstein v. McGivern,* [*supra*], ...

363 Pa. at 31–32, 68 A.2d 517 (citations omitted). In response to the defendant's argument that the principles of *MacPherson* applied only to chattels and not to realty, our Supreme Court stated succinctly, [t]here is no logical basis for such a distinction...." 363 Pa. at 34–35, 68 A.2d 517.

In *Prost v. Caldwell Store, Inc.,* 409 Pa. 421, 187 A.2d 273 (1963), our Supreme Court explained further:

The proposition contended for by the additional defendant was at one time the law of the land, but it has disappeared with the horse and buggy and the rule that a

husband is authorized to beat his wife with a stick no bigger than the thickness of his finger. ...

\* \* \* \* \* \*

No longer, when the consequences of negligence can be foreseen, does liability grow out of contract.

\* \* \* \* \* \*

Where a builder creates a hazard which without the need of a prophetic telescope, proclaims potential injury to the public, he may not plead immunity from liability for resulting damage on the basis that his responsibility ceased with the insertion of the last bolt and the driving of the final nail.

409 Pa. at 427–429, 187 A.2d at 276–77.

Finally, in *DeTillo v. Carlyn Construction, Inc.*, 416 Pa. 469, 206 A.2d 376 (1965), our Supreme Court held that a homeowner could sue the contractor, as well as the developer and the municipality, for damages alleged to have been caused by defective sewers installed by the contractor for the developer which were to have been inspected by the municipality. In rejecting a defense by the contractor based upon the absence of privity, our Supreme Court stated:

The next point raised by the appellant, D. Carapelluci Company, is that the storm sewer was installed while the developer, Carlyn Construction, Inc., owned the lot; therefore, there could be no trespass by the developer or his contractor. Even though the point is well taken, the plaintiff need not rely on a trespass to establish negligence on the part of the contractor. *It has long been the law that when it is obvious to a contractor that a third party would, necessarily in the course of events, be brought into contact with or would use the defective construction, then the contractor will be liable for injuries sustained by a third person caused by the negligence of the contractor.*

416 Pa. at 472, 206 A.2d at 378. (Emphasis added). Our Supreme Court has held that a contractor may be held liable for damages caused by the negligent installation of sewers

despite the absence of privity between the contractor and the homeowner. Ought liability be less certain when damages arise from *fraudulent non-installation* rather than *negligent installation?* We think not.

4.

In *Mill–Mar v. Statham, supra,* this Court held that liability for negligent misrepresentation could be recognized in particular cases despite the absence of privity. 278 Pa.Superior Ct. at 302, 420 A.2d at 550–51. This Court emphasized, however, that:

> Such cases must be decided individually, each, on its own facts. Particular care must be taken that what is being sought is not, in the words of Justice Cardozo, 'liability in an indeterminate amount, for an indeterminate time to an indeterminate class.' *Ultramares Corp. v. Touche,* 255 N.Y. 170, 178, 174 N.E. 441, 444 (1931).

278 Pa.Superior Ct. at 302, 420 A.2d at 551. We find that this portion of the holding in *Mill–Mar* applies equally, if not more so, to cases which involve fraudulent rather than negligent misrepresentation. *Cf.* Baxt, *The Liability of Accountants and Auditors for Negligent Statements in Company Accounts,* 36 M.L.R. 42 (1973) (discussing limits of liability for negligent misrepresentation under English law, noting similarities to the approach taken by Justice Cardozo in *Ultramares Corp. v. Touche, supra* ).

Assuming that the Dietrichs were not parties to the alleged fraudulent conduct by Smith, recognition of the Woodwards' cause of action against Smith would merely allow the right to recover for damages proximately caused by the fraudulent misrepresentations and concealed non-installation to pass from the seller to the buyer when subsequent transfer of the property substituted a new victim for the original victim of the undiscovered fraud. *Cf. Barnhouse v. City of Pinole, supra.* Under the facts alleged, only the identity of the victim was affected by the sale of the property by the Detrichs; the amount, duration, and class of persons to whom Smith was alleged to be liable for damages remained the same.

██ Other jurisdictions have recognized liability for fraudulent misrepresentation under similar circumstances. *See Mills v. Cosmopolitan Ins. Agency, Inc.*, 424 A.2d 43, 49 (D.C.App.1980) (collecting federal cases which adopted Restatement of Torts Section 531 and comment c); *Barnhouse v. City of Pinole, supra* (subsequent purchaser could sue developer for fraudulent concealment of failure to correct soil subsidence problems in accordance with the approved correction plan, despite the absence of contract privity); *Handy v. Beck, supra* (subsequent purchaser could sue well driller who fraudulently concealed defects in the well casings and seals from government officials and the previous owner, despite the absence of contract privity); Baxt, *supra*, 36 M.L.R. at 43, 54–55 (arguing that liability for *negligent* misrepresentations in documents filed as public financial records ought to be recognized as to persons who actually viewed the records, relied upon them, and suffered damages proximately caused by the reasonable reliance). If, as alleged, the Dietrichs were not aware of Smith's alleged fraudulent camouflaged non-installation of grey water sewage sewer connection, we can see no reason why the Dietrichs' sale of the home to the Woodwards should absolve Smith from liability for damages proximately caused by such fraud. When fraud creates or conceals a latent defect, transfer of the defective chattel or realty to an innocent third party should not absolve the wrongdoer from liability for damages caused by that undiscovered fraud. Thus, we find that this theory of liability was improperly rejected by the trial court.[10]

## V.

██ The Woodwards contend alternatively that the Dietrichs and Smith conspired together to conceal the non-instal-

---

**10.** We do not imply adoption of *Restatement of Torts 2d* Sections 531, 532, 533 and 536 in all possible circumstances. Though the basic principles espoused in those sections appear sound, we nonetheless remain of the opinion that each case must be decided on its own facts, and that care must be given to ensure that the liability sought is not indeterminate as to amount, duration, or class.

lation of the grey water sewage sewer connection. The Woodwards allege that the Dietrichs made fraudulent misrepresentations regarding the sewers upon which the Woodwards were specifically intended to rely; such intent meets even the restrictive test of *Gillespie, supra*. If Smith acted in concert with the Dietrichs, Smith would be liable for the misrepresentations made by the Dietrichs as an accomplice or co-conspirator (joint-tortfeasor). Thus, we conclude that this alternate theory of liability was also improperly rejected by the trial court.

## CONCLUSION

Based upon the foregoing, the order sustaining Smith's demurrer is vacated, the complaint against Smith is reinstated and the case is remanded for further proceedings consistent with this opinion. Jurisdiction is relinquished.

OLSZEWSKI, J., files concurring statement.

OLSZEWSKI, Judge, concurring:

I concur in the result of this case. I believe that the matter of whether or not *Gillespie v. Hunt*, 276 Pa. 119, 119 A. 815 (1923), should be overruled is a matter for our Supreme Court and not this Court as an intermediate appellate court.